# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DIANE GOLDRING NESBITT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JAMES REGAS, CHRISTIAN | ) | |
| NESBITT, REGAS, FREZADOS & | ) | No. 13 C 8245 |
| DALLAS, LLP, PETER REGAS, | ) | |
| PETER G. FREZADOS, WILLIAM D. | ) | Judge John J. Tharp, Jr. |
| DALLAS, SUZANNE REGAS, | ) | |
| ALLYSON REGAS, JERRY F. | ) | |
| MICELI, ADAMS APPRAISAL | ) | |
| CORP., and DOUGLAS ADAMS, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Diane Goldring Nesbitt ("Goldring") brings this action against eleven defendants, alleging that each played a role in a fraudulent scheme that resulted in substantial losses to Goldring. She asserts violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act Section 1962(c) against all defendants ("Count I"), RICO conspiracy claims against James Regas, Christian Nesbitt, Regas, Frezados & Dallas LLP, and Adams Valuation Corporation ("Count II"), as well as four state law counts relating to the alleged fraud. The Court has stayed briefing on the state law counts, and pending before the Court are a motion to dismiss filed by James Regas (Dkt. 24), a motion to dismiss filed by Allyson Regas (Dkt. 27), a joint motion to dismiss filed by Douglas Adams and Adams Valuation Corporation (Dkt. 30), and a joint motion to dismiss by Peter Regas, Peter G. Frezados, William D. Dallas, and the law firm Regas, Frezados & Dallas, LLP (Dkt. 32). Also pending is Goldring's motion for default

judgment against Suzanne Regas (Dkt. 68) as well as Suzanne Regas's motion to quash service or to dismiss (Dkt. 73).

For the reasons that follow, the motions by Allyson Regas (Dkt. 27) and Regas, Frezados & Dallas, LLP (Dkt. 32) are granted, and both Count I and Count II are dismissed against these movants without prejudice. Suzanne Regas's motion (Dkt. 73) is denied with respect to quashing service, but granted with respect to dismissing Count I against Suzanne Regas without prejudice. The motions by James Regas (Dkt. 25) and Adams Valuation Corp. (Dkt. 30) are granted in part, with respect to dismissing Count I without prejudice, and denied in part, with respect to Count II. Goldring's motion for default judgment (Dkt. 68) is denied. Accordingly, Count I is dismissed without prejudice as to James Regas, Allyson Regas, Suzanne Regas, Peter Regas, Peter Frezados, William Dallas, Regas, Frezados & Dallas LLP, Douglas Adams, and Adams Valuation Corp. Count II is dismissed without prejudice as to Regas, Frezados & Dallas LLP.

## BACKGROUND[1]

This case arises out of two bank failures caused by an unlawful insider loan scheme. In 2009, the Illinois Department of Financial and Professional Regulation closed Mutual Bank of Harvey ("Mutual Bank"), and the Federal Deposit Insurance Corporation ("FDIC") was appointed its receiver. Also in 2009, the Office of the Comptroller of the Currency ("OCC") restricted the operations of Western Springs Bank and Trust Co. ("WS Bank"), and entered into a consent decree. Eventually, in 2011, the FDIC shut down WS Bank, as well. Investigation of the records of both banks revealed extensive use of unlawful insider loans involving James Regas

---

[1] The facts in this chronology are drawn from the factual allegations of the complaint, which are taken as true on a motion to dismiss. *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

and his family members, who were insiders for both banks. James Regas was Chairman of WS Bank and Vice-Chairman of Mutual Bank, as well as outside general counsel for both banks.

The insider loans scheme involved Regas[2] using his position within the banks to approve illegal insider loans while obscuring the creditworthiness of the borrowers, concealing his own interest in the loans, inflating the appraised values of the real property securing the loans, and siphoning off funds for his own use. In order to do so, Regas and his longtime business partner Christian Nesbitt arranged for the law firm of Regas, Frezados, and Dallas, LLP ("RFD") to create business entities nominally under the control or ownership of Regas's children or Nesbitt's wife, Plaintiff Diane Goldring.[3] In reality, however, these entities were not legitimate business entities at all, and were instead sham entities under the control of Regas and Nesbitt. Nesbitt and Regas arranged for these entities to purchase real properties using funds loaned by the victim banks, using Regas's position as an insider at these banks. Nesbitt and Regas also arranged for Adams Valuation Corporation ("Adams Valuation") and its president Douglas Adams to systematically overvalue these real properties in its appraisals so that the sham entities could qualify for larger loans. Also, Nesbitt and Regas would arrange for Regas's son Dean Regas and Nesbitt's wife Goldring to unwittingly sign guarantees for these loans without knowing that the property values were inflated, that the loans did not go through proper underwriting procedures, or that the banks were unaware of Regas's self-dealing. Regas would ensure that the banks approved the loans without following proper underwriting procedures by

---

[2] There are four individual defendants named "Regas" in this case: James Regas, his brother Peter Regas, and his two daughters Suzanne and Allyson Regas. In addition, Goldring is suing the law firm of Regas, Frezados & Dallas LLP. Because James Regas is the alleged leader of the scheme, this Opinion will refer to James Regas as "Regas" and to his family members by their full names.

[3] Goldring's full name is Diane Goldring Nesbitt, but because she refers to herself as "Goldring," so does the Court. "Nesbitt" in this Opinion refers to Christian Nesbitt.

using his influence, with fellow bank officers Allyson Regas and Jerry F. Miceli, to pressure bank employees into approving the loans without following proper procedures. RFD would then represent all parties (the victim banks, guaranty victims like Goldring and Dean Regas, and the sham entities) in performing the legal work relating to the purchase and financing of these overvalued properties. Nesbitt and Regas would then skim off funds from the sham entities for their own personal use.

Goldring alleges that this basic scheme was executed multiple times. In October 2001, Regas directed RFD to create Baybrook Bristol LLC for the purpose of holding title to 32 acres of land, which was used to secure a loan from either Mutual Bank or WS Bank. In October 2004, Regas formed Hanover Capital Group, Inc. to purchase and purportedly develop 110 acres of land using loans from WS Bank or Mutual Bank. In November 2004, Regas formed Jefferson Capital Group, Inc. to purchase and develop 925 Edgemere Court in Evanston, Illinois, which was used to secure $5.7 million in loans from Mutual Bank. Ultimately, the Edgemere property was sold with a loan deficiency of $3.2 million. In December 2004, Regas created 1104 Sheridan LLC with plans to devote $1 million to develop a property at 1104 Sheridan.[4] In January 2005, Regas created SDAR LLC for development of multiple pieces of property in St. Francis, Wisconsin, and arranged for loans from Mutual Bank or WS Bank. In June 2005, Regas created 7500 Kenosha to purchase and develop property in Bristol, Wisconsin, and arranged for a $2.5 million loan from Mutual Bank. In May 2006, Regas formed 913 Forest-Evanston LLC, which purchased a $2.2 million property ("Forest Property") that was used to secure a $3.0 million purchase loan, which was later expanded to $3,425,500. Ultimately, the Forest Property was sold with a loan deficiency of $3.4 million. Also in May 2006, Regas formed Damen, Fullerton,

---

[4] The complaint does not describe the municipality in which the 1104 Sheridan is located.

Clybourn LLC to purchase and develop a property in Chicago. In September 2007, Regas formed 917 Edgemere LLC to purchase a property in Evanston, Illinois.

While executing this multi-year scheme, Regas and Nesbitt once arranged for Goldring to guarantee another loan under false pretenses and to personally lend $200,000 to her husband—which was falsely listed in bank records as a "correction offset," presumably to conceal the broader scheme. Eventually, the victim banks collapsed, and government investigators pieced together much of the information relating to the scheme. In June 2012, the federal government indicted Regas for his participation in the scheme. Regas pled guilty to lying to government agents and admitted that between 2004 and 2009 he repeatedly arranged for unlawful insider loans so that he could use bank funds for his own benefit while concealing the improper conflicts of interest.

After the banks collapsed, Goldring discovered that she was exposed to considerable guaranty liability on these loans, which she discovered were undersecured because of the inflated appraisal values on the collateral.[5] As a result, Goldring suffered losses in the form of three seven-figure judgments (Goldring has to date paid $200,000 in settling two out of the three judgments), the $200,000 personal loan to Nesbitt, approximately $150,000 in legal fees and costs, and approximately $25,000 in other indebtedness caused by the scheme. Goldring filed

---

[5] In his brief, Regas repeatedly belittles Goldring's claims as the product of domestic disputes she should have taken up with her (now former) husband, Nesbitt, and implying that because the insider loan scheme was not aimed at her, she cannot now sue defendants with whom she has never had any relationships, "legal or otherwise." He stops short, however, of asserting that she has no claim on that basis, however, and for at least two good reasons. First, because she was sued, and judgments were entered against her as a guarantor on a number of these undersecured loans, Goldring was (assuming her allegations to be true) indeed a direct victim of the fraud who relied on misrepresentations made in furtherance of the scheme. And second, even if that were not the case, "no showing of reliance is required to establish that a person has violated § 1962(c) by conducting the affairs of an enterprise through a pattern of racketeering activity consisting of acts of mail fraud." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 649 (2008).

this lawsuit, alleging a substantive civil RICO claim (Count I), RICO conspiracy claim (Count II), claim under Illinois Deceptive Business Practices Act (Count III), Fraudulent Inducement (Count IV), Fraud (Count V), and Aiding and Abetting a Fraud (Count VI). Defendants James Regas, Allyson Regas, and Suzanne Regas have each moved individually to dismiss the complaint.[6] RFD, Peter Regas, Peter Frezados, and William Dallas ("the Law Firm Defendants") have moved jointly to dismiss the complaint, as have Adams Valuation and Douglas Adams ("the Appraiser Defendants").[7]

## DISCUSSION

### I. Service of Process on Suzanne Regas

The Court first turns to the preliminary question of whether Defendant Suzanne Regas was properly served. Goldring filed her complaint on November 15, 2013. Goldring's attorneys sent requests for waivers of service to all the defendants in this case, pursuant to Fed. R. Civ. P. 4(d). Suzanne Regas did not return a waiver of service, although she was aware of the pending lawsuit. On December 20, 2013, Suzanne Regas sent a letter to her insurer and attached a copy of the complaint and summons in this case, explaining that she had not been personally served and had "no intention of waiving service." Suzanne Regas Letter, Dkt. 75-3, at 1. Goldring hired a process server, who attempted service at Suzanne Regas's home (which is also registered as her address with the Illinois Attorney Registration and Disciplinary Commission ("ARDC")), on five different occasions between February 26 and March 12, 2014. *See* Kirby Aff., Dkt. 75-4, at ¶¶ 5-7, 9, 11. Each time, the process server encountered a doorman at Suzanne Regas's residential building, and Suzanne Regas did not answer the doorman's phone calls. In addition, the process

---

[6] Suzanne Regas has also filed a motion to quash service on the basis that she was never properly served, but in the alternative has joined her codefendants' motions to dismiss.

[7] Christian Nesbitt answered the complaint.

server attempted service once at her parents' home and once at her former place of employment. The time limit prescribed by the Federal Rules of Civil Procedure expired on March 15, 2014, 120 days after the complaint was filed. *See* Fed. R. Civ. P. 4(m).

On August 29, 2014, Goldring filed a motion for service by publication. In that motion, Goldring outlined the five attempts to serve Suzanne Regas at home and the two attempts to serve her at other associated addresses. Mot. to Serve, Dkt. 65, at 2. The motion also brought to the Court's attention that Suzanne Regas was accused of evading service in another case relating to insurance coverage for Goldring's claims in this case. *See* Mot. for Service by Publication, *Wesco Ins. Co. v. Regas*, No. 14 C 716, Dkt. 12 (describing ten attempts to serve Suzanne Regas at home in April 2014); Mot. for Service by Publication, No. 14 C 716, Dkt. 26 (describing nine attempts to serve a cross complaint in May and June 2014). Further, the complaint in the *Wesco Insurance* case showed that Suzanne Regas was actually aware of this case. Goldring argued that further attempts to locate and personally serve Suzanne Regas "would be impractical and futile without assistance from the Court." After a hearing, the Court granted Goldring's motion with the additional requirement that Goldring also attempt service by overnight mail to Suzanne Regas's residence of record and to her parents' home address. *See* Minute Order, Dkt. 67.

After providing the alternative notice authorized by the Court, Goldring moved for a default judgment against Suzanne Regas. *See* Motion, Dkt. 68. A few days later, an attorney entered an appearance in this case on behalf of Ms. Regas, and she subsequently filed a motion to quash service of process (or, in the alternative, to dismiss the complaint). *See* Motion, Dkt. 73.

Ms. Regas argues that service was insufficient under federal and Illinois law. She first asserts that Rule 4(m) of the Federal Rules of Civil Procedure requires that the Court dismiss this case, because Goldring is not able to demonstrate "good cause" for an extension past the 120-day

limit and did not move to extend the time limit before the time expired. This "good cause" argument need not be considered, because even "[i]f the plaintiff cannot show good cause, then the decision to grant an extension is left to the discretion of the district court." *United States v. Ligas*, 549 F.3d 497, 501 (7th Cir. 2008) (citing *Henderson v. United States*, 517 U.S. 654, 662-63 (1996)). Further, plaintiffs are entitled to request (and courts have discretion to grant such requests) even after the 120-day time limit has already expired. *See United States v. McLaughlin*, 470 F.3d 698, 701 (7th Cir. 2006) ("When delay in service causes zero prejudice . . ., the granting of extensions of time for service, whether before or after the 120-day period has expired, cannot be an abuse of discretion"). In the absence of any prejudice to Ms. Regas (her motion identifies none), the Court was well within its discretion to extend the 120-day service period.

Second, Suzanne Regas argues that even if the Court did not abuse its discretion in failing to dismiss the case after the 120-day deadline, the manner of service was insufficient under the Federal Rules and Illinois law. The Federal Rules permit plaintiffs in this Court to effect service by following Illinois law. *See* Fed. R. Civ. P. 4(e)(1). Illinois law generally requires personal service or abode service, 735 ILCS 5/2-203(a), but also allows special service by court order when either personal service or abode service is impractical. *See* 735 ILCS 5/2-203.1. Special service may be authorized when two conditions are met: the plaintiff must show that "a diligent inquiry as to the location of the individual defendant was made and reasonable efforts to make service have been unsuccessful." *Id.*

As to the first condition, Goldring performed a "diligent inquiry as to the location of the individual defendant," *id.*, when she relied on Suzanne Regas's residence of record with the

ARDC,[8] and when the doorman at the building confirmed that Suzanne Regas lived at that address. *See* Kirby Aff., 65-2, at 3-4. All parties agree that Goldring's process server had the correct address for Suzanne Regas's residence. *See, e.g.*, Suzanne Regas Decl., Dkt. 74-1, at ¶ 3. Further, Goldring performed a diligent inquiry by exhausting the possibilities of attempting service at Suzanne Regas's former employer and her parents' home. *Id.*

Goldring also satisfied the second requirement of making "reasonable efforts to make service," 735 ILCS 5/2-203.1, through a process server trying on multiple occasions to effect service at Suzanne Regas's home, each time unsuccessfully trying to call Suzanne Regas and leaving a business card with the building's doorman. Unlike a single family house, Suzanne Regas's fourteenth-floor residence would not give a process server any external indicators of whether a resident is home. Further, the building doorman and lack of public access to Suzanne Regas's unit increase the practical difficulty of service. As required by 735 ILCS 5/2-203.1, Goldring filed with her motion for special service the process server's affidavit of diligence, outlining the attempts at her home, at her parents' home, and at her former place of employment. *See* Dkt. 65-2. Based on the record in this case of five unsuccessful attempts to serve Suzanne Regas, as well as ten unsuccessful attempts to serve a summons and nine separate unsuccessful attempts to serve a cross complaint in case number 14 C 716 in this Court, the Court determined that further efforts to attempt personal service or abode service on Suzanne Regas would be futile and therefore impractical. *See People ex rel. Waller v. Harrison*, 348 Ill. App. 3d 976, 804, 810 N.E.2d 589, 594 (Ill. App. Ct. 2004) ("[T]he statute does not require futile attempts to serve a defendant . . . ."); *compare Glens of Hanover Condominium Ass'n v. Carbide*, 2012 IL App

_____

[8] During this period of attempted service, Suzanne Regas was a practicing attorney licensed to practice in Illinois, and was therefore required to keep her ARDC address up to date. *See* ILCS S. Ct. Rule 756(c) (requiring notice to the ARDC within 30 days of an address change). She does not, in any event, contest that service was attempted at the correct address.

(2d) 120008-U, at ¶ 29 (Ill. App. Ct. 2012) (unpublished opinion) (disapproving of special service when process server made no effort to find defendant in places other than defendant's home). Suzanne Regas's post hoc argument that further attempts would not in fact have been futile and that she could have been served with further attempts is insufficient to show that the Court's earlier order was invalid. *See Waller*, 348 Ill. App. at 804-05, 810 N.E.2d at 594-95 (implicitly placing the burden on the defendant to show that a different course of action would have been successful in effecting service[9]). Therefore, this Court was authorized by Illinois law to grant service by special order under 735 ILCS 5/2-203.1.

Once personal or abode service are found to be impractical, "[t]he court order may order service to be made in any manner consistent with due process." 735 ILCS 5/2-203.1. In the context of service of process, due process requires only that the court provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Jones v. Flowers*, 547 U.S. 220, 226 (2006) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). Several factors lead the Court to believe that overnight mail to her home could reasonably be expected to provide actual notice. First, Suzanne Regas registered her home address with the Illinois ARDC, which indicates that her home address is the best place to contact her regarding attorney licensing and that she consents to service by mail at that address for ARDC proceedings. *See* ILCS S. Ct. Rule 765(a) (authorizing service for ARDC proceedings "by delivery of any such notice . . . to the address listed on the master role for the attorney"); ILCS S. Ct. Rule 765 committee comments (explaining that the rule was revised to provide for service "by lawful

---

[9] Under the federal rules, plaintiffs still bear the burden of showing that proper service occurred, *Cardenas v. City of Chicago*, 646 F.3d 1001, 1005 (7th Cir. 2011), but this is a separate question from whether an alternative method of service is permitted under Illinois law.

means other than personal service on an attorney"). Obviously, this proceeding is not an ARDC proceeding, but consent to being served by mail at an address for other matters suggests that this method can be "reasonably calculated" to provide actual notice of this proceeding. *Jones*, 547 U.S. at 226; *see also Sato v. Demos*, 2012 IL App (1st) 1112968-U, at ¶ 34 (Ill. App. Ct. 2012) (unpublished opinion) (holding that service pursuant to § 2-203.1 by mail to a P.O. Box where a landlord receives rent checks is sufficient to serve the landlord). Another factor suggesting that Suzanne Regas would have actual notice of this suit is that several of her family members and her former employer are defendants in this matter. Also, Suzanne Regas was already aware of this case and had already filed a claim with her insurance provider.[10] In addition, the method used to serve Suzanne Regas was also the method used to notify her as to Goldring's motion for default judgment, to which she promptly responded and appeared.[11] Finally, Suzanne Regas did not suffer any prejudice in this case. Despite appearing later than the other defendants, she is not in a different position from her co-defendants. With her motion to quash, she also filed a motion to dismiss, which is granted on the merits below. Therefore, the Court concludes that service by overnight mail to Suzanne Regas's ARDC-registered address, when combined with service by

---

[10] The other case in which Suzanne Regas was accused of intentionally evading service was a declaratory action by her insurer asserting that they had no duty to defend or indemnify her in this underlying RICO case. Attached to the complaint was a letter from Suzanne Regas that discussed this case, by case number, and discussed Suzanne Regas's beliefs as to the merits of Goldring's claims and the motivation behind the lawsuit. *See* Suzanne Regas Letter, *Wesco Ins. Co. v. Regas*, No. 14 C 716, Dkt. 1-C.

[11] Actual notice, standing alone, is of course insufficient to establish personal jurisdiction over a defendant, and Rule 4 must be strictly followed. *See, e.g.*, *United States v. Ligas*, 549 F.3d 497, 504 (7th Cir. 2008); *McMasters v. United States*, 260 F.3d 814, 817 (7th Cir. 2001). The Court has done so in this case, in determining that Rule 4(e)(1) allows service by any method permissible under Illinois law and that 735 ILCS 5/2-203.1 permits any manner of service consistent with due process.

overnight mail to her parents' home and service by publication, when Suzanne Regas already had actual notice of the suit, comported with the requirements of due process.[12]

In summary, the Court concludes that the manner of service on Suzanne Regas complies with the requirements of Rule 4, 735 ILCS 5/2-203.1, and the Due Process Clause, and that this Court may therefore exercise personal jurisdiction over Suzanne Regas. Accordingly, Suzanne Regas's Motion to Quash Service, Dkt. 73, is denied with respect to quashing service of process, dismissing the complaint for lack of personal jurisdiction, or dismissing the complaint for insufficient service of process. On the other hand, because Suzanne Regas has appeared and responded to the complaint, Goldring's Motion for Default Judgment Against Suzanne Regas, Dkt. 68, is denied.

## II.     Elements of a § 1962(c) Claim

The Court now turns to the defendants' motions to dismiss. Goldring alleges that she is entitled to recover under RICO's civil cause of action because she has been injured by the defendants' RICO violations. Specifically, Goldring alleges that the defendants violated RICO Section 1962(c), which states:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). As the Supreme Court has explained, a § 1962(c) violation has four elements: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) (footnote omitted). Further, a

---

[12] Having concluded that Rule 4(e)(1) permits service in accordance with state law and that the Court followed the requirements of 735 ILCS 5/2-203.1 in authorizing service by overnight mail in this case, the Court need not consider whether the service by publication was valid under 735 ILCS 5/2-206.

plaintiff in a civil RICO action must show that she suffered an injury proximately caused by the substantive RICO violation. *James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 403 (7th Cir. 2006) (citing *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006)).

## A.      "Conduct of an Enterprise"

The "conduct" and the "enterprise" elements of a § 1962(c) violation are closely related, and determining the "conduct" of the enterprise first requires the determination of what the alleged enterprise is and who its members are. Therefore, the Court first analyzes what the structure and identity of the enterprise and who its members are, and then analyzes the allegations against each defendant to determine whether they participated in the "conduct" of that enterprise.

### 1.      The Enterprise

Enterprises can be formal associations with a clearly defined legal structure, such as a corporation, partnership, or other business entity, or enterprises can be informal associations of persons, sometimes referred to as "association-in-fact" enterprises. Goldring asserts that the defendants comprised an association in fact enterprise that "did not go by a specific name." Compl., Dkt. 1, at ¶ 64. She alleges that the racketeering enterprise "acted as a continuing and cohesive unit," the primary objective of which was to "illegally steal funds belonging to the Banks and to make other unwitting third parties—and not themselves—legally responsible in the event that any of the fraudulent loans . . . were not repaid." *Id.*

An association-in-fact enterprise must have an ascertainable structure with "three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The Supreme Court in *Boyle* rejected inferring additional structural requirements, such as a "hierarchical structure," "fixed roles" for its

members, "name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies." *Id.* at 948. In doing so, the Supreme Court abrogated a body of Seventh Circuit case law that required RICO enterprises to have a more discernable structure through hierarchical organization or leadership. *See Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 388 (7th Cir. 2010) ("But the Supreme Court's recent decision in *Boyle v. United States* throws all in doubt.") (internal citation omitted). Thus, pleading the *existence* of an enterprise does not require allegations that plausibly establish anything more than the three structural features listed in Boyle.

None of the defendants seriously, or effectively, argues that the complaint's allegations are sufficient to satisfy *Boyle*'s three structural requirements, so a brief review of the facts supporting each requirement necessary to plausibly allege the existence of an enterprise will suffice.[13] Goldring alleges that the enterprise had a common purpose of enriching the defendants—especially Regas and Nesbitt—at the expense of WS Bank, Mutual Bank, Regas's son Dean Regas, and Goldring herself. Compl., Dkt. 1, at ¶¶ 1-2, 4-5. The complaint adequately alleges relationships between Regas and Nesbitt, who were longtime business partners and controlled multiple business entities together. *Id.* at ¶¶ 3, 6. Further, Regas had longstanding family and business relationships with Allyson Regas, Peter Regas, Suzanne Regas, the RFD firm and its partners, who in turn had family and business relationships with one another. *Id.* at ¶¶ 19-24, 28-29, 31. The complaint also alleges that the Adams defendants had relationships with each other and with Regas. *Id.* at ¶¶ 36-38, 40-41. The third Boyle requirement, longevity

---

[13] The Adams defendants briefly argue that the complaint does not establish "even the existence of a RICO enterprise under a common goal," but does not expand on this argument further, as the rest of the paragraph argues that Adams did not share in any profits of the purported scheme. Adams Br., Dkt. 30, at 7 (citing *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004)). Profits are not a *Boyle* requirement, and the profit-sharing argument is analyzed separately below.

sufficient to achieve the enterprise's purpose, is met by the complaint's allegation of an eight-year scheme involving at least seven illegal loans and five sham business entities. *See id.* at ¶¶ 31(a), (c), (f), (g), 44-45, 52, 58, 60; Pl.'s Resp., Dkt. 42, at 8-9.

### 2. Conduct of the Enterprise's Affairs

*Boyle* may have confirmed that the definition of a RICO "enterprise" is expansive, but the Seventh Circuit has since clarified that *Boyle* did not do away with the requirement that a plaintiff prove that the defendant "person" be a distinct entity from the "enterprise" or that the defendant used the enterprise to further an illegal scheme. *See United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853-54 (7th Cir. 2013) ("Section 1962(c) requires a plaintiff to identify a 'person'—*i.e.*, the defendant—that is distinct from the RICO enterprise. And that 'person' must have 'conducted or participated in the conduct of the "*enterprise's* affairs," not just [its] own affairs.'") (internal citations omitted); *Jay E. Hayden Found.*, 610 F.3d at 389 ("Even so, the RICO offense is *using* an enterprise to engage in a pattern of racketeering activity."). A RICO complaint—especially one that alleges an association-in-fact enterprise where the distinctions between the alleged "enterprise" and the individual defendants may not be clear—must allege that the defendant acted on the enterprise's behalf, rather than merely serving the defendant's own, individual, interests. *See, e.g., Walgreen Co.,* 719 F.3d at 854-855 (drug manufacturer and pharmacy did not conduct affairs of an enterprise where complaint failed to set forth how alleged drug-switching scheme advanced enterprise interests independent of the defendants' respective individual interests); *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 400 (7th Cir. 2009) (holding that a marketing arrangement by which an insurance company targeted a membership organization's members for fraud would not suffice to suggest that either the insurance company or the membership organization acted on behalf of any shared enterprise); *Richmond v. Nationwide*

*Cassel L.P.*, 52 F.3d 640, 647 (7th Cir. 1995) (finding that defendants were not distinct from an association-in-fact enterprise when the complaint alleged only that the defendants defrauded the plaintiff directly, without the participation of other enterprise members).

To conduct, or participate in the conduct of, the affairs of an enterprise, a defendant must "participate in the operation or management of the enterprise itself." *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993). That does not mean, however, that § 1962's reach is limited to those who were calling the shots; the Reves Court also noted that an enterprise also may be operated "by lower-rung participants . . . who are under the direction of upper management." *Id.* at 184; *see also MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 978-79 (7th Cir. 1995) (reversing dismissal of § 1962(c) claim against low-level firms who carried out directions of other members of the enterprise). Operation and management of an enterprise does not, however, include an outsider acting as "merely a hireling," *Bachman v. Bear, Stearns & Co.*, 178 F.3d 930, 933 (7th Cir. 1999).[14] Under *Reves*, "a RICO enterprise may be operated at least by upper management, lower-rung participants in the enterprise who are under the direction of

---

[14] Goldring argues that the holding in *Bachman* has been limited by the Seventh Circuit's later ruling in *United States v. Sheneman*, 538 Fed. App'x. 722 (7th Cir. 2013), which observed that a defendant who does not directly receive any disbursed funds from a wire fraud scheme may still be guilty of wire fraud when he intentionally participates in a scheme to enrich another co-schemer. *Id.* at 723–24. Goldring's reliance on *Sheneman* is misplaced for three independent reasons. First, the issue discussed in *Sheneman* was whether a person could be guilty of wire fraud without receiving any proceeds, not whether a participant who only receives its normal fees participated in the "operation or management" of a RICO enterprise. *See id.* Second, the language cited by Goldring is dicta and is not binding on this court. *See id.* at 723 (noting that the evidence at trial "showed that Sheneman *did* receive $360,000 directly from the property sales, plus more than $600,000 his [co-conspirator] gave him."). Finally, *Sheneman* was an *order* published in the Federal Appendix, not an *opinion* published in the Federal Reporter, so even the holding would not be binding on this court. *See* 7th Cir. R. 32.1 ("Orders, which are unsigned, are released in photocopied form, are not published in the Federal Reporter, and are not treated as precedents.").

upper management, or others associated with the enterprise who exert control over it . . . .'"
*MCM Partners*, 62 F.3d at 977 (internal quotation omitted).

To meet this standard with respect to an association in fact enterprise, the complaint must therefore plead facts plausibly alleging that the defendants engaged in a degree of cooperation and coordination "that fell outside the bounds of the parties' normal commercial relationships." *Walgreen Co.*, 719 F.3d at 856; *see also In re Insurance Brokerage Antitrust Litig.*, 618 F.3d 300, 378 (3d Cir. 2010) (holding that members of an enterprise "participated in the operation or management of the enterprise itself" by "commit[ing] [violations] that they [could not] accomplish alone" in a coordinated bid rigging scheme) (quoting *Reves*, 507 U.S. at 183; Gregory P. Joseph, *Civil RICO: A Definitive Guide* 332 (3d ed. 2010)).

An important factor in assessing whether a defendant can be deemed to have participated in the enterprise's affairs, rather than its individual affairs, is whether the scheme's success depended on a particular defendant's knowing cooperation, or whether that particular defendant played a fungible role that could have been performed by outsiders. *Compare Insurance Brokerage*, 618 F.3d at 378 (finding each participant in bid-rigging to be acting on behalf of the enterprise because the scheme could not succeed without all bidders colluding), *and MCM Partners*, 62 F.3d at 979 (finding lower-rung participants to be "vital" to the scheme's success because "only they had the ability" to effectuate the scheme), *with Reves*, 507 U.S. at 186 (no "operation or management" for outside auditor hired to prepare financial reports), *Walgreen Co.*, 719 F.3d at 856 (no "operation or management" of enterprise, despite both participants knowing of the other's role, when pharmacy could have accomplished its role in the scheme without the drug manufacturer's knowledge, and drug manufacturer could have accomplished its role in the scheme with any pharmacy chain), *and Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727-28

(7th Cir. 1998) (no "operation or management" for granting a license of one's own name and likeness to promote enterprise or distributing promotional materials for the enterprise).[15]

Even gross departures from industry practice may not be enough to show more than an ordinary commercial relationship, if there is another business reason for the hired outsider's actions. *See Walgreen Co.*, 719 F.3d at 854 ("[N]othing in the complaint reveals how . . . these communications or actions were undertaken on behalf of the enterprise as opposed to on behalf of [the alleged participants] in their individual capacities, to advance their individual self-interests."); *D.M. Robinson Chiropractic, S.C. v. Encompass Ins. Co. of Am.*, No. 10 C 8159, 2013 WL 1286696, at *10 (N.D. Ill. Mar. 28, 2013) ("Though Plaintiffs make much of the fact that Mitchell was interested in retaining Allstate's business, a vendor's interest in retaining its business relationship is neither unusual nor suspicious.").

Turning to Goldring's allegations in this case, the Court must analyze whether each moving defendant satisfies the *Reves* requirement that each defendant participate in the "operation or management" of the alleged distinct enterprise rather than acting for itself.

a)      *James Regas*

As alleged, the conduct of Regas (and Nesbitt[16]) easily suffices to plausibly allege participation in the management and operations of the alleged enterprise. According to the

---

[15] This line of demarcation does not fully explain the Seventh Circuit's reasoning in *Jay E. Hayden Foundation v. First Neighbor Bank*, 610 F.3d 382 (7th Cir. 2010). In that case, the Seventh Circuit held that there was no use of an enterprise by bank employees who helped conceal a long-running embezzlement scheme. *See id.* at 384–85, 389. That case can be distinguished on another basis because the predicate acts of racketeering were committed by a single conspirator acting on his own behalf, so the Seventh Circuit determined that the defendants, in covering up that leading conspirator's actions, "did not use the conspiracy (the enterprise); they were the conspiracy." *Id.* at 389.

[16] Nesbitt has not moved to dismiss the complaint, and so has not challenged the sufficiency of the allegations that he conducted, or participated in conducting, the affairs of an

complaint, Regas and Nesbitt orchestrated the scheme, while others—lawyers, appraisers, corporate shareholders and officers, and bank officers—acted at Nesbitt's or Regas's direction. The complaint accuses both Nesbitt and Regas of creating and using multiple sham entities and directing the actions of the other defendants to obscure from the banks the real nature of these self-dealing loans. Like the *Hosseini* defendants' commingling of funds and joint operation of the multiple auto dealerships (without regard to the formal legal ownership of the entities), *see* 679 F.3d at 548-49, 558, Regas and Nesbitt are alleged to have freely transferred money from these entities to themselves, without regard to the formal shareholders of the sham entities. Compl., Dkt. 1, at ¶¶ 4-7, 28-34. These allegations easily surpasses the *Reves* minimum threshold requirement that Regas play "some part in directing the enterprise's affairs." 507 U.S. at 179.

Further, the enterprise alleged was distinct from Regas acting on his own behalf. Regas used the sham entities (and the associated shareholders and officers) to conceal his self-dealing interest and the high risk of default in the loans, and the concealment of Regas's involvement could not have succeeded without multiple participants "acting in concert on behalf of a shadow enterprise." *See Walgreen Co.*, 719 F.3d at 855. According to the complaint, the amounts approved in the insider loans were also inflated through Regas's alleged agreement with Adams Valuation to inflate the appraised values of the collateral, furthering the scheme's purpose of siphoning off as much money as possible. Compl., Dkt. 1, at ¶ 36. These allegations go beyond "garden variety" commercial relationships or "parallel, uncoordinated fraud," because the inflated appraisal portion of the scheme could not have succeeded with Nesbitt and Regas only acting on their own. *Walgreen Co.*, 719 F.3d at 855; *see also Insurance Brokerage*, 618 F.3d at

---

enterprise. His conduct is discussed here only as necessary to provide context to the allegations regarding the participation of Regas and other defendants in the affairs of the alleged enterprise.

378 (finding conduct of an enterprise where "defendants band together to commit violations they cannot accomplish alone") (internal quotations omitted). Regas and Nesbitt needed the participation and acquiescence of, at a minimum, the banks and the appraisers, to carry out the insider loan scheme. Like the "prototypical RICO case," the alleged scheme involved the use of formal business entities and their "appearance of legitimacy to perpetrate more, and less easily discovered, criminal acts." *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997). Therefore, the complaint is more than sufficient to state that Regas was a member (indeed, the head) of an enterprise distinct from himself.

*b)*      *Law Firm Defendants*

The complaint also alleges that Regas controlled the law firm defendants in furtherance of the scheme. At Regas's behest, RFD allegedly created at least some of the sham entities and performed the legal work relating to the loans, the real property securing those loans, and obtaining the third party guarantees. Compl., Dkt. 1, at ¶¶ 29, 31, 42. As an example, Goldring asserts:

> So, it would be quite common that Regas (and the Regas Firm at his direction) would prepare the corporate-creation documents for the underlying corporate entity and then follow that by preparing the loan transaction documents for one of the Banks, while the entire time keeping from the Banks the fact that the loans were being issued to the Entities, companies that Regas himself had created and continued to control.

*Id.* at ¶ 42.

These allegations are essentially that Regas used RFD as a law firm, to provide legal services—an ordinary commercial relationship. The complaint does not allege that the law firm defendants knew of the insider loan scheme or that the legal work that they were engaged to

provide related to entities that were fictitious or transactions that were fraudulent.[17] It does allege

that RFD breached its duties and knowingly put its own interests or Regas's interests before that

of the banks (which would be an unsurprising consequence, given the highly conflicted nature of

the alleged representation), but the fact that the law firm defendants may have taken

engagements that presented inappropriate conflicts of interest does not turn RFD's relationship

with the enterprise into an "insider" relationship. *See Walgreen Co.*, 719 F.3d at 856 (no conduct

of an enterprise even when both participants knew of the other's "activities [that] were by all

appearances illegal"). Nor was RFD's participation vital to the success of the scheme, because

unlike the colluding bidders in *Insurance Brokerage* or the sole contracting authorities in *MCM*

*Partners*, the scheme could have succeeded even if RFD had refused to participate. *See*

*Insurance Brokerage*, 618 F.3d at 378; *MCM Partners*, 62 F.3d at 979. Indeed, the complaint

alleges that Regas himself sometimes did the legal work necessary to create the sham legal

entities. Compl., Dkt. 1, at ¶ 29. Further, any law firm—not just RFD—could have performed

the legal work of creating business entities and preparing loan transaction documents,

particularly given the fact that it was not essential (and is not alleged) that the law firm

defendants knew of the insider loan scheme. Accordingly, RFD's role in the scheme is more like

that of the fungible auditors of *Reves* or *Bachman*. Even if the complaint is correct about RFD's

role in the scheme, the allegations are only enough to accuse RFD and its attorneys[18] of being

---

[17] The Complaint does not sufficiently allege that James Regas was a partner in RFD or
that his knowledge is imputable to that firm for any other reason.

[18] The Court concludes that the complaint does not state a claim against Suzanne Regas
for her role as an attorney at RFD, but because Goldring also accuses Suzanne Regas of playing
other roles in the scheme, those allegations are analyzed separately below. The complaint also
describes Peter Regas as "Secretary and Treasurer" of WS Bank, but does not allege that he took
any actions in that capacity to further the scheme.

mere "hirelings." *Bachman*, 178 F.3d at 933. Thus, the complaint fails to state a § 1962(c) claim against RFD or its attorneys.

c)      <em>Appraiser Defendants</em>

The complaint alleges a more active role in the operations of the enterprise for the appraiser defendants. Goldring alleges that Adams Valuation agreed to systematically overvalue properties in appraisals performed on the real property controlled by Regas. Compl., Dkt. 1, at ¶ 36. In exchange, Regas would exercise his control over Mutual Bank to retain Adams Valuation for approximately 50% of the appraisals. *Id.* The appraiser defendants argue that this case bears much in common with *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, where a district court dismissed § 1962(c) claims against appraisers who were alleged to have inflated appraisals of real properties. 373 F. Supp. 2d 829, 837-38 (S.D. Ind. 2005). That court held that even though the appraisers played a critical role in the scheme, they were nonetheless "outside" the enterprise because the plaintiffs had failed to allege that the appraisers had knowledge of the scheme, had failed to allege the actual values of the subject properties, and had failed to allege the appraisers' involvement in the predicate acts of racketeering. *Id.* at 837-38. In contrast, Goldring has alleged that Adams Valuation "agreed" to the scheme, has listed the true values of the subject properties in this case, and has identified several specific allegedly inflated appraisals performed by Adams Valuation. Compl., Dkt. 1, at ¶ 36. These specific allegations paint a knowing, involved, and integral role played by Adams Valuation that required Adams Valuation to perform certain acts differently than would have been performed by other appraisal firms. So while this Court agrees that the *Decatur Ventures* court applied the correct test, applying that test to the appraisers of this case leads to a different result.

The Adams defendants argue that they did not "act[] in any way distinct from their normal professional capacity" as appraisers, Adams Reply, Dkt. 50, at 3, but the complaint

alleges differently, and at this juncture the Court must credit the allegations of the complaint as correct. Moreover, the inflated appraisal values were not merely "a vendor's interest in retaining its business relationship" with the banks, *D.M. Robinson Chiropractic*, 2013 WL 1286696 at *10, because inflating appraisal values advanced the interests of the enterprise *at the expense of their own clients* (in this scheme, the banks that required the appraisals of the property securing the loans). Therefore, the complaint sufficiently alleges that the Adams defendants had more than just ordinary business relationships with the enterprise and were knowing participants in the enterprise.

Finally, the appraiser defendants argue that they did not participate in the conduct of the enterprise because the complaint "does not present a single factual claim asserting that Adams had any interest in the outcome of the alleged scheme beyond his own individual interest" or that the appraiser defendants "shared in any profits of the alleged enterprise or received any additional fees . . . beyond its customary fee." Adams Br., Dkt. 30, at 7–8. That argument overlooks the fact that while its fee may have been normal, the high volume of appraisals it conducted for the enterprise may not have been; the fee is only one variable that affects whether the firm derived benefit from the enterprise and the Complaint plausibly alleges that Adams Valuation was the beneficiary of an unusually, and inappropriately, high volume of work relating to the enterprise. Compl., Dkt. 1, at ¶ 36. The appraiser defendants cite *Bachman*, which they argue imposes a requirement that a defendant share in the profits or in the proceeds of an illegal scheme in order to be liable under § 1962(c). Adams Br., Dkt. 30, at 8. *Bachman* could be read to suggest such a requirement in its discussion of a mere "hireling" that only received its "normal fee," 178 F.3d at 933, but a profit-sharing requirement cannot be reconciled with *MCM Partners*, where the Seventh Circuit held that "operation" of an enterprise could even include a

participant's acquiescence to *losing* money to advance the enterprise's goals.[19] 62 F.3d at 979. Rather, *Bachman* teaches that profit-sharing can be a relevant (but not dispositive) factor in determining whether a defendant was member of the enterprise or an outside "hireling." 178 F.3d at 933. Therefore, despite being silent on what interest Adams Valuation had in the success of the scheme, the complaint sufficiently alleges that the appraiser defendants participated in the operation or management of the enterprise.

d)      *Allyson and Suzanne Regas*

The complaint contains very few allegations pertaining to the claims against Allyson and Suzanne Regas. The complaint alleges that James Regas listed his daughters Allyson and Suzanne as "members and shareholders" in the sham entities, but it also alleges a similar role for Goldring herself as a purported victim. Compl., Dkt. 1, at ¶¶ 28, 31(a)-(c), 31(f)-(g), 44. More importantly, the complaint does not allege any actions taken by Suzanne or Allyson Regas in their capacities as members or shareholders in these entities so the Court has no facts to analyze under the *Reves* "operation or management" test.

The complaint does, however, accuse Allyson Regas, in her capacity as Chief Financial Officer and Vice President of one of the victim banks, of "substantially assist[ing]" Regas by obtaining inflated appraisals, approving the loans without using proper underwriting practices,

---

[19] The scheme alleged in *MCM Partners* had a purpose of maintaining a monopoly on forklift rentals, which benefited the "upper management" of the scheme, but also resulted in the "lower-rung" defendants having to pay above-market prices as customers of the forklift rental services. *See* 62 F.3d at 971. The Seventh Circuit held that these "lower-rung" defendants— coerced into following "upper management" orders—could still qualify as participants in the operation of the enterprise, despite the fact that the enterprise's success would result in *losses*, rather than profits, for these participants. *Id.* at 979.

and concealing the true nature of the loans. Compl., Dkt. 1, at ¶ 54.[20] In other words, the complaint alleges that Allyson Regas abused her position as a bank officer to knowingly put the interests of the enterprise above the interests of the bank to whom she owed a fiduciary duty. These allegations go far enough beyond the purely self-interested actions alleged in *Walgreen Co.* or *Jay E. Hayden Foundation* to assert that Allyson Regas "improperly hijack[ed] the business operations of [the bank] for illicit ends." *Walgreen Co.*, 719 F.3d at 854-55; *see also Jay E. Hayden Found.*, 610 F.3d at 389 (observing in dicta that the complaint could have sufficiently stated a RICO claim if the plaintiff had alleged that the bank officers used the bank to commit fraud). Therefore, the complaint's allegations suffice to establish that Allyson Regas participated in the conduct of an enterprise in her capacity as a bank officer, but are insufficient to state a claim against Suzanne Regas.

**B.     "Pattern of Racketeering Activity"**

A plaintiff alleging a § 1962(c) violation must also establish that the enterprise acted "through a pattern of racketeering activity." 18 U.S.C. § 1962(c). "Pattern" means "at least two acts of racketeering activity" within a 10-year period, and usually will require more than two. *Id.* § 1961(5); *see also H.J. Inc. v. Nw. Bell. Tel. Co.*, 492 U.S. 229, 232 (1989). Further, the plaintiff "must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H.J. Inc.*, 492 U.S. at 239. For RICO violations predicated on acts of mail fraud or on obstruction of justice involving dishonesty, the complaint must identify the predicate acts with particularity. Fed. R. Civ. P. 9(b); *Jepson, Inc. v. Makita Corp.*, 34 F.3d

---

[20] The Court notes that the same allegation is leveled against defendant Miceli, who has not yet been required to respond to the Complaint. There seems little reason to believe that the analysis would be any different with respect to him.

1321, 1327 (7th Cir. 1994) (mail fraud).[21] Therefore, to survive these motions to dismiss, the complaint must identify with particularity predicate acts of racketeering that are both "related" and "continuous." *H.J. Inc.*, 492 U.S. at 239, 242.

Mail fraud under 18 U.S.C. § 1341 requires the defendant's (1) participation in a scheme to defraud; (2) with the intent to defraud; (3) using the mail in furtherance of the fraud. *See* 18 U.S.C. § 1341; *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010). "Intent to defraud," the second element, "requires a wilful act by the defendant with the specific intent to deceive or cheat." *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004). Rule 9(b) requires "only a general outline" of the scheme to defraud and the intent to defraud, but must "describe the predicate acts with some specificity and 'state the time, place, and content of the alleged communications perpetrating the fraud.'" *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992) (quoting *Graue Mill Dev. Corp. v. Colonial Bank & Trust Co.*, 927 F.2d 988, 992 (7th Cir.1991)).

Each individual mailing in furtherance of the scheme would qualify as a distinct mail fraud violation. *See, e.g.*, *United States v. Giovenco*, 773 F.3d 866, 868 (7th Cir. 2014) (describing six counts of mail fraud as six mailings to advance one fraudulent scheme). To constitute a mail fraud violation, an individual mailing need not contain misrepresentations, or

---

[21] Although not every conceivable violation of 18 U.S.C. § 1512 (titled "Tampering with a witness, victim, or informant") would necessarily involve fraud or dishonesty, Goldring's complaint clearly alleges that the defendants "fraudulently concealed extensive facts," "repeatedly told [Goldring] it was nothing to worry about," and "fabricate[d] buyers to extend [a] falsehood." Compl., Dkt. 1, at ¶¶ 43–45. These particular § 1512 allegations sound in fraud, so in this case, Rule 9(b) also governs these allegations. *See Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (claims "premised upon a course of fraudulent conduct" implicate Rule 9(b)'s heightened pleading requirements regardless of whether fraud is an element of the claims themselves); *Jones v. Ada S. McKinley Cmty. Servs.*, No. 89 C 319, 1989 WL 105231, at *3 (N.D. Ill. Sept. 1, 1989) (applying Rule 9(b) to RICO claims predicated on § 1512 violations).

even be essential to the scheme—it is enough that an individual mailing be "incident to an essential part of the scheme." *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (quoting *Pereira v. United States*, 347 U.S. 1, 8 (1954)). And unlike common law fraud, federal mail fraud only requires that the fraudulent scheme cause the plaintiff's injuries in some way and does not require that the harmed plaintiff personally rely on the fraudulent misrepresentations. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 648-49, 656-57 (2008) (holding that a RICO violation predicated on mail fraud could occur even without a plaintiff's first party reliance, as when a plaintiff is harmed by a third party reliance on the defendant's representations).

Turning to the individual mailings alleged in this case,[22] the majority have little to no relation to the alleged fraud. The mailings from non-defendants that amount to service of documents relating to other litigation[23] are not even "incident to an essential part of the scheme." *Schmuck*, 489 U.S. at 710. If anything, those mailings contain truthful information from fellow victims of the scheme that would tend to *frustrate*—rather than advance—the scheme by alerting Goldring to the fraud. Similarly, Goldring gives no indication of how letters from non-defendant creditors or government agencies furthered the scheme or caused her losses, and so those mailings must be disregarded as well. This leaves only seven remaining mailings alleged to constitute mail fraud:

---

[22] Since Goldring has identified specific mailings and their contents in her proposed Amended Appendix A, Dkt. 46, she has satisfied Rule 9(b)'s particularity requirements regarding the mailings. *Midwest Grinding*, 976 F.2d at 1020.

[23] Goldring's proposed Amended Appendix A, Dkt. 46, lists 17 letters from law firms (who have not named as parties in this case) serving copies of summons, pleadings, motions for default judgment or for summary judgment, supporting briefs, notices of depositions, notices of hearings, and court orders relating to litigation against Goldring in her capacity as guarantor of the delinquent loans or in her capacity as officer in the sham entities.

| Date | From | To | Description |
|------|------|-----|-------------|
| 2006-06-09 | Adams Valuation | Tom Pacocha (Mutual Bank) | Letter and Appraisal for 913-15 Forest Avenue in Evanston |
| 2006-07-27 | Martin Hall (Regas, Frezados & Dallas LLP) | David Azran | Letter re: 913 Forest-Evanston LLC |
| 2006-08-09 | Bette Lally (Mutual Bank) | Diane Goldring | Letter enclosing appraisal for 913-915 Forest Ave in Evanston |
| 2007-03-17 | James Regas (Regas Frezados & Dallas LLP) | Diane Goldring | Letter re: "Various Projects"[24] |
| 2011-06-28 | Suzanne Regas (7500 Kenosha LLC) | Diane Goldring | Demand for payment of expenses with accompanying exhibits |
| 2011-09-21 | Suzanne Regas (7500 Kenosha LLC) | Diane Goldring | Demand for payment of expenses with accompanying exhibits[25] |
| 2012-03-19 | Christian Nesbitt | Illinois Secretary of State | 2010 Annual Report for North Park Webster 2011 Annual Report for North Park Webster 2012 Annual Report for North Park Webster Application for Reinstatement |

Am. App. A, Dkt. 46, at 1-4.

The first three letters listed, from 2006, concern a property at 913 Forest Avenue in Evanston, Illinois. The complaint's allegations relating to this "Forest Property" are that the Regas Firm incorporated an LLC called "913 Forest-Evanston LLC" under the actual control of Regas and Nesbitt, but with the purported managing members listed as "Dean and Suzanne

---

[24] This letter was incorporated by reference in Exhibit 3 of the complaint, the Government's Sentencing Memorandum in James Regas's criminal case, Dkt. 1-3, at 3, which was in turn incorporated by reference in the complaint itself. *See* Compl., Dkt. 1, at ¶ 8. Even if the contents could not be considered to fall within the four corners of the complaint, a redacted version of the letter is available as a public record on James Regas's criminal case docket, *see* Exhibit B, *United States v. Regas*, 12 CR 461, Dkt. 27-2, and the Court could simply take judicial notice of its contents. Fed. R. Evid. 201(b); *see also Michigan v. U.S. Army Corps of Eng'rs*, 758 F.3d 892, 899 (taking judicial notice of official government reports).

[25] This letter is listed twice on Goldring's proposed Amended Appendix A to the complaint. *See* Dkt. 46, at 3.

Regas, and, for a time, Goldring." Compl., Dkt. 1, at ¶ 31(g). Regas and Nesbitt arranged for the Forest property, worth $2.2 million, to be overvalued in order to secure a $3.0 million loan. *Id.* at ¶¶ 38-39. To facilitate the loan, Regas and Nesbitt induced Goldring to personally guarantee the loan. *Id.* at ¶ 31(g). In a separate agreement, Regas and Nesbitt agreed to pay $450,000 from the loan to repay an investor, Azran Forest LLC ("Azran Forest"). *Id.* at ¶ 39. Although Regas and Nesbitt attempted to fraudulently withhold payment to Azran Forest, eventually Azran Forest sued and accepted a $412,500 settlement. *Id.* Even after paying the Azran settlement, Regas and Nesbitt still "managed to successfully divert approximately $387,500" for themselves. *Id.* With this background, the fact that each of these three mailings was "incident to" the scheme is clear. *Schmuck*, 489 U.S. at 710. In the first letter, Adams Valuation sent the appraisal overvaluing the property by $800,000 to Mutual Bank as part of the loan approval process. The second letter, written by RFD attorney Martin Hall on behalf of 913 Forest-Evanston LLC, falsely represented to David Azran that there were insufficient funds to pay Azran—which Azran alleged was part of a conspiracy to defraud Azran. *See* Azran Compl., Dkt. 1-8, at ¶ 28. The third letter, from Mutual Bank, forwarded the falsely inflated appraisal in a communication to Goldring, who was a personal guarantor on the loan. *See* Compl., Dkt. 1, at ¶ 31(g). This inflated appraisal understated the substantial guaranty exposure incurred by Goldring, who could not appreciate that the property would eventually be foreclosed and that she would be personally liable for the deficiency in excess of $3.4 million. *Id.* Each of these mailings is identified with particularity in the complaint and each is related to the ongoing scheme.

The letter from James Regas to Goldring, sent on RFD letterhead on March 13, 2007, reported the status of the projects and business entities involving Regas, Nesbitt, and Goldring. In her complaint, Goldring accuses Regas and Nesbitt of four specific material omissions in

persuading Goldring to sign the loan guarantees: (1) that the appraised values of the property securing the loans were artificially inflated, (2) that the loans did not follow underwriting formalities, (3) that the lenders were unaware of Regas's self-dealing, and (4) that the loans were procured in flagrant disregard of regulatory obligations and internal bank procedures. Compl., Dkt. 1, at ¶¶ 4-5. The March 13 letter does not mention the inflated appraisals, the hidden risks of default, or Regas's unlawful means of obtaining the loans; as such, it was an instrument of the fraud (assuming, as the Court must, that the letter is fraudulent because it fails to advise Goldring of those issues).

The complaint provides no context or description for the other three letters written by Suzanne Regas and Christian Nesbitt. It is unclear what Suzanne Regas's letters said or what role they played in the alleged scheme.[26] It is also unclear what purpose was served by Christian Nesbitt's letters to the Illinois Secretary of State. Therefore, those letters have not adequately provided "the who, what, when, where, and how" required under Rule 9(b) to show that the letters were in furtherance of the alleged scheme (as necessary to constitute predicate acts of racketeering). *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

Goldring also alleges several instances of obstruction of justice, especially by Nesbitt. The complaint accuses Nesbitt of concealing information and preventing Goldring's receipt of correspondence relating to pending lawsuits in which Goldring had been sued on her personal guarantees, which delayed Goldring's discovery of the broader scheme by several years. Compl., Dkt. 1, at ¶ 44. Further, Nesbitt allegedly fabricated false buyers for the properties (including the creation of forged documents) in order to persuade Goldring not to investigate further into her own guarantee liability. *Id.* at ¶ 45. These allegations are not sufficient to state predicate

---

[26] As discussed above, the complaint does not provide enough detail to tie Suzanne Regas to the operation or management of the enterprise.

racketeering actions under § 1512(c)(1) of the obstruction of justice statute, because that statute relates solely to acts taken with "the intent to impair the [document's] integrity or availability for use in an official proceeding." Goldring does not allege that Nesbitt, or any other defendant, tried to prevent the use of any document in any proceeding; rather, she alleges that Nesbitt concealed or altered such documents so that she would not be aware of the true status of law suits that had been filed against her. In other words, § 1512(c)(1) addresses attempts to conceal or tamper with evidence; that is not what Goldring alleges Nesbitt to have been doing when he concealed information about the lawsuits from her. Goldring alleges that Nesbitt concealed or altered documents to prevent Goldring from discovering the scheme and fails to explain how such documents would have been used in an official proceeding.[27]

In summary, then, Goldring's complaint and her proposed amended appendix outline four predicate acts of racketeering: three letters relating to the Forest Property mailed in 2006, and one letter written by James Regas that relates to the broader scheme relating to multiple properties and business entities. In order for Goldring to recover, however, these four predicate acts of racketeering must be sufficiently "related" to constitute a pattern. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). As the Supreme Court has observed, "relatedness" requires "similar purposes, results, participants, victims, or methods of commission." *Id.* at 240 (quoting *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 n.14 (1985)). The relatedness requirement is not a particularly strict requirement. Here, the four letters served the scheme's general purpose of using inflated property appraisal values to obtain loans and guarantees of value. The three letters regarding to the Forest Property persuaded both the bank and Goldring to rely on Adams Valuation's inflated appraisal, and attempted unsuccessfully to prevent Azran Forest from

---

[27] In any event, all of the law suits at issue were filed in state court. Section 1512(c)(1) applies only to federal proceedings. *See* § 1515(a)(1).

collecting funds owed at closing. *See* Compl., Dkt. 1, at ¶ 39. The letter from Regas outlined a broad overview of multiple projects relating to the overall scheme, and presumably furthered the scheme by persuading Goldring to continue guaranteeing loans. *See generally* Regas Letter, *United States v. Regas*, 12 CR 461, Dkt. 27-2 (N.D. Ill. Dec. 10, 2012). These mailings, relating to the same broad scheme, are sufficiently related to each other and to the scheme.

Racketeering activity must also "pose a threat of continued criminal activity" in order to qualify as a "pattern." *H.J. Inc.*, 492 U.S. at 239. The parties agree that this case must be evaluated for "closed-end continuity," which may be found in a "closed period of repeated conduct." *Id.* at 241. The Seventh Circuit has outlined relevant factors for courts to determine the continuity of a pattern: "Relevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986). Of *Morgan*'s continuity factors, the duration factor is the "most important." *Roger Whitmore's Auto. Servs., Inc. v. Lake Cnty., Ill.*, 424 F.3d 659, 673 (7th Cir. 2005); *see also Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) (describing the duration factor as "the closest thing we have to a bright-line continuity test").

Generally, the predicate acts underlying a "one-shot scheme" must occur over the course of more than a year in order to form a pattern. *Midwest Grinding*, 976 F.2d at 1024 (collecting cases where periods of "several months" to "several years" were insufficient to support a pattern); *see also Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 474-75 (7th Cir. 2007) (ten months insufficient); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 782 (7th Cir. 1994) (nine months insufficient). The earliest of the predicate acts occurred with a letter mailed on June 9, 2006, and the latest occurred about nine months later, on March 17, 2007. This nine-

month period is insufficient under the Seventh Circuit case law. This conclusion is reinforced by the fact that the only predicate acts that Goldring has successfully alleged are mailings, which "'are unique among predicate acts' because multiplicity of such acts 'may be no indication of the requisite continuity of the underlying fraudulent activity.'" *Midwest Grinding*, 976 F.2d at 1024 (quoting *U.S. Textiles, Inc. v. Anheuser-Busch Cos., Inc.*, 911 F.2d 1261, 1266 (7th Cir. 1990)) Courts have found insufficient continuity between even hundreds of mailings when the number of fraudulent transactions are small. *See Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 781 (7th Cir. 1994) (finding no "pattern" from racketeering predicated only on a few acts of mail fraud); *Midwest Grinding*, 976 F.2d at 1024 (hundreds of mailings insufficient because there was only a single scheme with "a few" recipients and only one victim); *see also Hartz v. Friedman*, 919 F.2d 469, 473 (7th Cir. 1990) ("The Seventh Circuit, however, does not look favorably on relying on many instances of mail and wire fraud to form a pattern.").

And while Goldring has alleged a long, multi-year scheme in which the defendants had engaged in fraudulent and even criminal activity, only the predicate acts of *racketeering* count for the duration factor. Tortious or even criminal acts committed before the first act of racketeering do not start the clock. *See Midwest Grinding*, 976 F.2d at 1024 & n.5 (starting the duration count with "the first predicate act of mail fraud" rather than when the alleged coconspirators "began doing the groundwork"). Similarly, actions taken to cover up the completed scheme do not extend the duration, either. *Id.* (holding that actions to cover up discovery "do nothing to extend the duration of the underlying . . . scheme"); *see also Jennings*, 495 F.3d at 474 (declining to consider later fraudulent cover-up attempts in the duration analysis). Therefore, although Goldring has alleged a long-running scheme involving a pattern of criminal activity with multiple perpetrators and multiple victims, the complaint falls short of

alleging sufficient duration to establish a pattern of *racketeering* activity as defined in 18 U.S.C. § 1961(1).

### III.    RICO Conspiracy Under § 1962(d)

Goldring also asserts a RICO conspiracy claim against Regas, Nesbitt, RFD, and Adams Valuation. Compl., Dkt. 1, at ¶ 70-73. A RICO conspiracy within the scope of § 1962(d) requires a showing that "(1) the defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir.2011). In addition, the plaintiff must allege injury from an act that is . . . independently wrongful under RICO," that is, a predicate act of racketeering. *Beck v. Prupis*, 529 U.S. 494, 505-06 (2000).[28]

As discussed above, Goldring alleges sufficient facts to infer conduct of an enterprise involving James Regas, Christian Nesbitt, Adams Valuation, and Allyson Regas (but not RFD).[29] Unlike the substantive RICO claim, however, a RICO conspiracy claim does not need to identify with particularity the two predicate acts, but only needs to allege an agreement that two predicate acts would occur. *See Gas Tech. Institute v. Rehmat*, 05 C 2712, 2006 WL 3743576, at *33 (N.D. Ill. Dec. 15, 2006) ("The Seventh Circuit has not required the pleading of claims under § 1962(d)

---

[28] In *Beck*, the Supreme Court left open the question of whether a RICO conspiracy claim must allege injury arising from an actionable violation of the substantive provisions of the act (§ 1961(a)-(c))—that is, whether the plaintiff's claimed injury must have been caused by a violation of RICO rather than just by conduct alleged to constitute a predicate act of racketeering. *See Beck*, 529 U.S. at 506 n.10. To the Court's understanding, this remains an open question; it is not discussed in *DeGuelle*, which appears to transmute *Beck*'s holding that a claim that alleges injury from conduct that does not constitute a predicate act fails to state a claim for RICO conspiracy to an affirmative holding that an allegation of injury arising from a predicate act will suffice. Neither party has addressed the question in this case.

[29] The complaint only names Regas, Nesbitt, RFD, and Adams Valuation in Count II, and does not assert Count II against Allyson Regas or Douglas Adams. *See* Compl., Dkt. 1, at 27.

with particularity, nor has this court."); *Nat'l Org. for Women, Inc. v. Scheidler*, 897 F. Supp. 1047, 1071 (N.D. Ill. 1995) (holding that RICO conspiracy claims are governed by the liberal pleading standards of Fed. R. Civ. P. 8(a), not the heightened requirements of Fed. R. Civ. P. 9(b)). From the detailed allegations of the role each defendant played in the operation of the enterprise over course of years, it is fair to infer that each willing participant in the enterprise agreed to participate in the scheme and that acts of wire or mail fraud would occur throughout the multi-year duration of the scheme.

Further, and as discussed above, Goldring has already alleged several injuries suffered as a result of mail fraud in furtherance of the scheme. Mailings relating to the Forest Property led Goldring to rely on Adams Valuation's inflated appraisals in choosing to guarantee the loan, which ultimately led to a Goldring paying a $100,000 settlement, as well as legal fees, to resolve a $3.4 million judgment. *See* Compl., Dkt. 1, at ¶ 31(g); Am. App'x A, Dkt. 46, at 1. The March 13, 2007 letter sent by Regas to Goldring misrepresented the fundamental nature of Goldring's guarantees and the risk of default. *See generally* Regas Letter, *United States v. Regas*, No. 12 CR 461, Dkt. 27-2 (N.D. Ill. Dec. 10, 2012). Goldring identifies losses arising out of decisions made after the letter was sent, including a personal $200,000 loan that she agreed to provide on October 1, 2008. *See* Compl., Dkt. 1, at ¶ 58. And while the alleged mailings may not constitute a pattern of racketeering activity and therefore do not constitute a substantive RICO violation, this Court reads *DeGuelle* and *Beck* to allow plaintiffs to state RICO conspiracy claims for injuries caused by racketeering acts when the other RICO conspiracy elements are met—even if the plaintiff falls short of proving that a pattern of racketeering activity actually occurred. When read with the allegations of the broader fraudulent scheme, Goldring's injuries are sufficient to

support a RICO conspiracy claim. Therefore, the defendants' motions to dismiss Count II must be denied as to James Regas and Adams Valuation; it is granted as to RFD.

*       *       *

In a nutshell, the complaint alleges that Nesbitt and Regas created sham entities, which (under Nesbitt's and Regas's control) purchased real property, and Adams Valuation appraised the properties at inflated values so that the bank officer defendants (Allyson Regas and Jerry Miceli) would approve undersecured insider loans, allowing Nesbitt and Regas to siphon off the excess funds for their own personal use. These allegations suffice to allege that James Regas, Christian Nesbitt, Douglas Adams, Adams Valuation, and Allyson Regas participated in the affairs of a RICO enterprise. The complaint falls short, however, in alleging that they did so through a pattern of racketeering activity. Nevertheless, the complaint adequately alleges that defendants Regas, Nesbitt, and Adams Valuation conspired to do so, and that Goldring was injured by the alleged predicate acts of racketeering, namely Regas's false letter of March 13, 2007, and three letters relating to the Forest Property. Therefore, the Court concludes that the complaint fails to adequately allege a violation of 18 U.S.C. § 1962(c)(1), and dismisses that Count without prejudice, but adequately alleges a violation of 18 U.S.C. § 1962(d). Goldring is granted leave to file an amended complaint that addresses the deficiencies identified in this Memorandum Opinion.


_John J. Tharp, Jr._

_____
John J. Tharp, Jr.
United States District Judge

Dated: March 20, 2015

36